National Park Bank *v.* Ninth National Bank.

———•••———

## THE NATIONAL PARK BANK OF NEW YORK vs. THE NINTH NATIONAL BANK.

Although the drawee of a draft is bound to know the handwriting of the drawer, and when he pays a draft on which the name of the drawer has been forged, he is bound to bear the loss to the same extent he would have been if the signature had been genuine, yet the liability extends no farther.

Where a genuine draft has been altered, not only in the name but in the amount to be payable, the rule does not hold the drawee liable for any more than the amount of the original draft. The balance, he may recover of the person from whom he received the draft and to whom he paid the money. SUTHERLAND, J., dissented.

APPEAL from an order made at a special term, sustaining a demurrer to the amended complaint in this action.

It was alleged in said amended complaint, that the plaintiff is and, at the times hereinafter mentioned, was a corporation, duly incorporated and existing under and by virtue of an act of the congress of the United States, entitled "An act to provide a national currency, secured by a pledge of United States bonds, and to provide for the

circulation and redemption thereof," approved June 3d, 1864, and has capacity to sue by the above title. That the defendant was, at the times herein mentioned, and still is, a corporation, duly incorporated and existing under and by virtue of said act. That at said times, the Ridgely National Bank of Springfield, Illinois, was, and now is, a corporation duly incorporated under and by virtue of said act. That at Springfield, Illinois, on March 25th, 1867, said Ridgely National Bank drew its certain draft or bill of exchange, numbered 48558, dated at said place, on that day, wherein and whereby it directed the plaintiff to pay to the order of Ely Shirley the sum of $14.20. That said Ridgely National Bank thereupon delivered said draft to the payee. That thereafter, and before the payment by the plaintiff to the defendant hereinafter mentioned, the amount of said draft was changed from $14.20 to $6300, and the name of said payee was changed from Ely Shirley to E. G. Fanchon, Esq. That said changes in the amount and name of the payee of said draft were made fraudulently, and without the authority, consent or knowledge of said Ridgely National Bank or the plaintiff; that the name of Wm. Ridgely, cashier, signed to said draft, being the name of the cashier of said Ridgely National Bank, and the name by which the drafts of the same were drawn, was taken out or erased from said draft, before the payment thereof by the plaintiff, by means of acid or other chemical process, and that the said name was thereupon rewritten by the person who made said erasure as originally made. That the changes and rewriting of the said name as aforesaid were unknown to the plaintiff until May 10th, 1867, as hereinafter stated. That after the alterations above mentioned, and before the payment of said draft by the plaintiff, the same was discounted by the Lexington National Bank, and became the property thereof, and by it was indorsed to the defendant. That after such alterations, indorsement and delivery to the defendant, and on or about April 12th, 1867, the de-

National Park Bank *v.* Ninth National Bank.

fendant indorsed said draft, and presented the same to the plaintiff, bearing the indorsement of said Lexington National Bank, and an indorsement purporting to be the indorsement of E. G. Fanchon, and demanded the payment thereof. That said Fanchon, at the time of said indorsement, was cognizant of, and privy to, said alterations. That on or about said April 12th, 1867, the plaintiff, in ignorance of said alterations, and supposing that the draft was as drawn, paid the said amount of $6300 to the defendant on said draft, as so altered, and received said altered draft from the defendant, and now has the same in its possession. And the plaintiff alleged that on or about May 10th, 1867, it for the first time knew or discovered said alterations, and that said draft was not genuine as to the amount and payee thereof; and that the plaintiff forthwith, and on said May 10th, 1867, notified the defendant of the fact of said alterations, and demanded the repayment of the sum of money paid to the defendant as aforesaid, and tendered said draft to him, and offered to return the same on the repayment of the amount due, and that it still is, and ever since has been, ready to return said draft to the defendant on the repayment of said sum; and the defendant refused, and ever since has refused, to repay said sum, or any part thereof. And the plaintiff averred that it had been guilty of no negligence or laches in the premises. That the signature, Wm. Ridgely, cashier, rewritten on said draft as aforesaid, and now being thereon, has been recognized as genuine by said Ridgely National Bank and the plaintiff, and that said draft is recognized by said Ridgely National Bank and the plaintiff as genuinely drawn for said sum of $14.20, so far as concerns the signature of said cashier. Wherefore, the plaintiff demanded judgment against the defendant for the principal sum of $6400, less $14.20, the amount of the genuine draft, to wit, $6285.80, with interest from April 12th, 1867, and the costs of this action.

The defendant demurred to the said amended complaint, for the grounds that it appears upon the face thereof:

*First.* That there is a defect of parties plaintiff herein in this, that the Ridgely National Bank of Springfield, Illinois, should have been made a party plaintiff to this action.

*Second.* That there is a defect of parties defendant herein in this, that the Lexington City National Bank of Lexington, Kentucky, should have been made a party defendant to this action.

*Third.* That the said amended complaint does not state facts sufficient to constitute a cause of action.

The following opinion was given by the justice at special term, on deciding the issue raised by the demurrer:

SUTHERLAND, J.   It appears from the complaint that not only the amount and name of the payee of the bill or draft was altered, but also that the name or words "Wm. Ridgely, cashier," purporting to be the signature of the cashier of the drawer to the altered draft or bill, was forged, or counterfeited.   The case, therefore, made by the complaint, is within the rule laid down by Lord Mansfield in *Price* v. *Neale,* (3 *Burr.* 1354.)   This decision was not overruled in *Smith* v. *Mercer,* (6 *Taunt.* 76,) but was recognized by a majority of the judges.   Neither in *Smith* v. *Mercer* nor in *Cocks* v. *Masterman* (9 *B. & C.* 902) were the plaintiffs the drawees, but they were the bankers of the drawees.   The rule laid down in *Price* v. *Neale* was fully recognized in *Canal Bank* v. *Bank of Albany,* (1 *Hill,* 287;) *Bank of Commerce* v. *Union Bank,* (3 *N. Y. Rep.* 230;) *Goddard* v. *Merchants' Bank,* (4 *id.* 147;) and *United States Bank* v. *Bank of Georgia,* (10 *Wheat.* 333.)   The elaborate and able brief submitted by the counsel for the plaintiff has failed to satisfy me that I would be justified, either by precedent or authority, in so altering or qualifying the rule as laid down in *Price* v. *Neale* that it will not include the

plaintiff's case, or in making the plaintiff's case an exception to the rule. The defendant therefore must have judgment on the demurrer, with costs.

From this decision the plaintiff appealed.

*Barlow & Hyatt,* for the appellant. I. The general rule of law is, that money paid under a mistake of fact can be recovered back in an action for money had and received.

There is no doubt that the plaintiff paid this money to the defendant under the common mistake of all parties as to the facts. The Park Bank paid this draft under three mistakes of fact. 1st. As to the genuineness of the signature of the drawer. 2d. In ignorance of the change in the name of the payee. 3d. In ignorance of the change in the amount.

II. But the defendant claims that the case of a forged draft paid by the drawee is an exception to the above mentioned general rule. It claims the rule to be, that such drawee is estopped from denying the signature of his drawer, and if he pays a forged bill he cannot under any circumstances recover the money, no matter how careless the holder may have been, and no matter whether or not the recovery would put the holder in a worse position than if the payment had never been made.

III. We, on the other hand, claim that the party paying a forged draft can recover in two cases: 1st. Where the holder or party receiving has himself been careless or in fault; that is, that the loss must fall where the first carelessness has been in point of time. 2d. Where, although there has been no fault on the part of the holder, yet the recovery will put him in no worse position than if the payment had never been made. That is to say, where the drawee has done any act to give currency to the paper (as by acceptance, &c.) on the faith of which the holder has taken it, or the condition of the holder will be altered for the worse in any way, as where he received the draft

for collection, and paid over the proceeds to an insolvent principal before he received notice of the forgery, then the party paying is precluded from recovering by the ordinary rules of estoppel—otherwise not. If the court shall assent to these rules as we lay them down, we shall show that we come within them both. The rule, as claimed by the defendant, has never been established by decisions in this State. It has been assumed to be the law in several cases in the Court of Appeals, which will be referred to hereafter, but the court will see that the assumption was *obiter*, and not necessary to the decision of the cases. Therefore this court is not restrained by any authority of our own courts from laying down such rule as seems best upon principle.

IV. At the bottom of all the law on this subject are four English cases, which we ask the court to examine critically. The leading case of all is *Price* v. *Neale*, (3 *Burr.* 1354,) decided by Lord Mansfield in 1762. Price, the drawee, had paid two forged bills drawn on himself, and sued to recover back the money from Neale, the holder. *Held* that he could not recover. One bill he had accepted before Neale took it, and the decision as to that one came within the rule as we admit it to be, and the ordinary rules of estoppel. The other bill he had simply paid, having done nothing to give it currency. This case is like the one at bar, and is unquestionably a decision in favor of the rule as contended for by the defendant. Lord Mansfield rests his decision on two grounds: 1st. That all the negligence was on the side of the plaintiff; that "it was incumbent on the plaintiff to be satisfied of the hand of the drawer, but it was not incumbent on the defendant;" "that whatever neglect there was, was on his (the plaintiff's) side;" that "it is a misfortune which has happened without the defendant's fault or neglect;" and, 2d. On the ground that even if there were no neglect on the part of the plaintiff, yet there was no rea-

son for throwing the loss from one innocent person upon another. In other words, that where both were equally innocent, (by which is meant free from negligence,) the plaintiff could not recover; but the loss must lie where it has fallen. Now this last ground has been wholly repudiated, and if *Price* v. *Neale* can be sustained at all, it must be on the ground that all the negligence is on the part of the party paying. The law now is, that where both parties are innocent, or free from carelessness, or both are negligent, the party paying can recover. *Price* v. *Neale* properly turned on the negligence of the plaintiff. See *Markle* v. *Hatfield*, (2 *John.* 462.) And as to the law just laid down, i. e., that where both parties are equally negligent or equally free from negligence, the party paying can recover, see *Canal Bank* v. *Bank of Albany*, (1 *Hill*, 290,) where it is said, "for the very reason that the parties were equally innocent, the plaintiffs have a right to recover," &c. &c. In the case cited, the negligence of both parties was the same. (See page 290, line 6.) See, also, on this point, Dallas, J., in *Jones* v. *Ryde*, (5 *Taunt.* 495.) So in the *Merchants' Bank* v. *McIntyre*, (2 *Sand.* 431, 436,) Ch. J. Oakley says: "Either the defendants knew of the defect, * * * or they were at least equally negligent with the plaintiffs. In the latter case it is the ordinary case of mutual ignorance of an important fact, and either party may rescind, and the plaintiff may recover." See also *Ellis* v. *Ohio Life Ins. Co.*, (4 *Ohio Rep.* [*N. S.*] 661,) where this is stated to be the New York rule. The idea that in equal negligence the plaintiff cannot recover, is based upon a mistaken application of the maxim, "*In pari delicto, potior est conditio defendentis.*" This maxim, however, is based upon the moral turpitude of the parties, which induces the law to decline to help either party on grounds of public policy. It does not apply to innocent mistakes. Therefore we ask the court to carefully bear in mind that the second ground

of Lord Mansfield's decision, i. e., that the plaintiff cannot recover where both parties are equally free from negligence, or equally negligent, is wholly repudiated by the subsequent cases, and, among others, by those just cited. The next case is *Smith* v. *Mercer*, (6 *Taunt.* 76,) decided in 1815. Temple had drawn a bill on Evans. The plaintiffs were the bankers of Evans, and the bill was presented to them by the defendant, bearing what purported to be an acceptance by Evans, payable at the plaintiffs' bank. The plaintiffs paid it, and having discovered that the acceptance by Evans was forged, brought an action to recover back the money. The court held that they could not recover, because the forged direction to them to pay the bill was like the call of a bill drawn upon them, and they were bound to know the handwriting of their customer, Evans. This also is like our case, and an authority for the rule contended for by the defendant. But the judges were not unanimous, nor did their opinions rest on the same grounds. Dallas, J., decides for the defendants on the first ground of *Price* v. *Neale*, to wit, that all the negligence was on the side of the plaintiffs, but he brought in the point of change in the holder's situation and the actual loss, and gave it a prominent place. Heath, J., decides for the defendants, on the same ground. Chambre, J., dissented, and repudiated point blank the doctrine of *Price* v. *Neale*, and made some very forcible remarks on Lord Mansfield's doctrine, that it is not unconscientious for the defendant to retain the money. (See page 84.) Gibbs, Ch. J., decides for the defendants, on the ground that indorsers were discharged, thereby putting it upon just the ground which we contend for, i. e., the change in the situation of the holder. He does not dissent from the ground taken by Dallas, J., and Heath, J., neither does he assent to it. It will be seen that only two out of four judges assent to the principle of *Price* v. *Neale*. We shall criticise that case hereafter in connection with the case at

bar. Mr. Justice Sutherland has intimated, in his opinion in this case, that the fact that the plaintiffs in *Smith* v. *Mercer* were not the drawees, but the bankers of the drawees, distinguishes that case from the one at bar. But the direction of Evans to the plaintiffs, his bankers, to pay the draft, was like any other direction of a drawer to his drawee. The question was whether the plaintiffs were bound to know the handwriting of their customer, Evans, which is the same general question involved in this case. The next case is *Wilkinson* v. *Johnson,* (3 *Barn. & Cress.* 428.) In that case the plaintiffs were the bankers of A. Heywood, Son & Co., and took up for their honor a bill on which their name was forged as indorsers, and on discovering the forgery they brought the action to recover back the money, and it was held they could recover. Being the bankers of A. Heywood, Son & Co., they were within the rule contended for by the defendant—as much bound to know the handwriting of their correspondents as the Park Bank in this case was bound to know the handwriting of its correspondents, and yet it was held that the plaintiff could recover. This case therefore, in effect, overrules *Price* v. *Neale.* It will not do to say that the fact that the forgery was discovered the same day, distinguishes it from *Price* v. *Neale;* because, as Abbott, Ch. J., says, on page 434, of *Wilkinson* v. *Johnson,* "The decision of Lord Mansfield, in *Price* v. *Neale,* appears not to have been grounded on the delay." *Price* v. *Neale* in no way turned on the delay, or on the injury done to the holder, or any change in his condition. It merely went on the ground that the negligence of the plaintiff was such as to deprive him of any rights which any one was bound to respect. Therefore the circumstance, that in *Wilkinson* v. *Johnson* the forgery was discovered on the same day, makes no difference, and that case virtually overrules *Price* v. *Neale.* It is true the court attempted to distinguish the case from *Price* v. *Neale,* because of a natural reluctance to overrule

the prior decision of the same court, and the supposed distinction arises out of the fact that the payment is for honor. But this is no real distinction, as our Court of Appeals say, in *Goddard* v. *Merchants' Bank*, (4 *N. Y. Rep.* 147, *head note, 2d paragraph, and page* 149 ;) for if the rule be that it is inexcusable negligence for the drawee not to know the handwriting of his drawer, it applies with as much force where the payment is for honor, as in any other case, and the court, in *Ellis* v. *Ohio Life Ins Co.*, (4 *Ohio Rep.* [*N. S.*] 655,) expressly says, with reference to *Wilkinson* v. *Johnson*, that the payer for honor is in the same position as an ordinary drawee. Now, one of two things is certain—either *Wilkinson* v. *Johnson* overrules *Price* v. *Neale* outright, which disposes of this case, or it rests upon the distinction that "the circumstances of the call upon the plaintiff (drawee) were such as might reasonably lessen his attention, and that the fault was not wholly his own." (See page 436.) We shall refer hereafter to the circumstances which bring us within this case, if it rests upon this distinction. Abbott, Ch. J., says: "Such a call, for payment, imports on the part of the person making it, that the names of the correspondent for whose honor the payment is asked, is actually on the bill;" and that "the attention of the person making the payment may reasonably be lessened by the assertion that the call itself makes to him in fact, though no assertion may be made in words; and the fault, if he pays on a forged signature, is not wholly and entirely his own, but begins at least with the person who thus calls upon him." This case also decides, "that where there is any fault in the party receiving, and he cannot be said to be wholly innocent, he ought not to profit by the mistake into which he may by his prior mistake have led the other, unless there be a change in the situation of parties," &c. That is, where the fault begins, there the loss should fall. The next case is *Cocks* v. *Masterman*, (9 *Barn. & Cress.* 902.)

This, also, is an authority for the defendant herein, if it can be sustained. In this case the bill was paid on May 24th, and the forgery was discovered and notice given to the defendant on the next day, May 25th, in time to give notice to all the indorsers. Yet it was held that the plaintiff could not recover. The court seem to have felt the absurdity of holding that the mere payment of a bill by the drawee, where he had done nothing to give it currency, and the condition of the holder would not be changed by the recovery—which is the doctrine of *Price* v. *Neale*—should preclude the party paying from recovering. Therefore, they being in the element of injury to the defendant, that is, that the delay to discover the forgery until the next day, though no indorser had been discharged, deprived the holder of a right, was an injury to him, which precluded the plaintiff from recovering. This bringing in the element of actual injury to the holder was a step in the proper direction, and is, in effect, the rule which we contend for—that is, that where the recovery does not change the condition of the holder for the worse, the party paying may recover. But we do combat the assumption of the court, as a matter of law, that the delay to discover the forgery until the next day, no indorser having been discharged, was an injury to the holder. We shall discuss hereafter the question of "injury to the holder," but here will merely remark, that on this point *Cocks* v. *Masterman* is inconsistent with *Wilkinson* v. *Johnson*, and we submit that the latter is the much better considered case. The delay to discover the forgery in the latter case was not held to bar a recovery. But it will be said that the delay to discover the forgery in *Wilkinson* v. *Johnson* was only a few hours, while in *Cocks* v. *Masterman* it was twenty-four hours, and that the difference in the facts prevents the two cases from being inconsistent. But why have you a right to assume, as matter of law, that a delay of twenty-four hours injures the holder more than a delay

of three hours? Where injuries to the holder from the delay are the ground of resisting the recovery, there are only two logical courses—either to require the holder to show the actual injury, which we claim to be the proper rule, or else to presume and hold, if you are to make any presumption about it, that any delay in discovering the forgery, i. e., the mere fact of payment, is sufficient to bar a recovery. It is absurd to assume as matter of law, that twenty-four hours delay produces irreparable injury, while three hours do not. *Wilkinson* v. *Johnson* having shown that a few hours delay does not, of itself, bar a recovery, you cannot consistently with that case hold that twenty-four hours delay must, of itself, inflict such an injury as bars the plaintiff. In *Canal Bank* v. *Bank of Albany,* (1 *Hill,* 287,) *Cocks* v. *Masterman* is disapproved, and in *Goddard* v. *Merchants' Bank,* (2 *Sand.* 257,) it is stated to conflict with *Wilkinson* v. *Johnson.*

V. These are the four cases on which all the law rests. They rest on the negligence of the party paying, and that negligence consists in the neglect of the "means of knowledge." The drawee is supposed to have a superior means of knowledge, in that he has paid other drafts of his correspondents, and by comparing the signatures and by other means can detect the forgery. Now there have been two English cases decided since 1840, which entirely overrule the doctrine that a payment of this kind is such laches as precludes the party paying from recovering in the cases where no harm is done to the holder. These cases are *Kelly* v. *Solari,* (9 *Mees. & Wels.* 54,) and *Townsend* v. *Crowdy,* (8 *Com. Bench,* [*N. S.*] 477.) The first of these cases decides that even forgetfulness of facts which were once known does not have this effect. In *Kelly* v. *Solari,* a policy of life insurance had lapsed and become void, for failure to pay the premium. The directors were informed of this, and actually marked the policy "lapsed," but forgetting the fact, paid a loss under it, and

National Park Bank *v.* Ninth National Bank.

then brought action to recover the payment. In *Townsend* v. *Crowdy*, the plaintiff was to pay the defendant a certain sum for his business, provided the profits had amounted to a sum named. He examined the books, and satisfying himself that the specified sum had been realized, paid the defendant, and having afterwards discovered his mistake, brought an action to recover the money. In both these cases it was held that the plaintiff could recover, and the doctrine stated by Bailey, J., (the same judge who decided *Cocks* v. *Masterman*,) in *Milner* v. *Duncan*, that means of knowledge was equivalent to knowledge, and that a neglect of it was laches, is utterly repudiated. Williams, J., says, in *Townsend* v. *Crowdy*, (*p.* 494,) "No doubt at one time the rule that money paid by mistake of fact might be recovered back, was subject to the limitation that it must be shown that the party seeking to recover had been guilty of no laches." But since *Kelly* v. *Solari*, it is established that it is not enough that the party had means of knowledge. Byles, J., says, (p. 495,) "Here the money was paid by a mistake. That being so, it was manifestly against conscience that the defendant should retain it. It would be inequitable not to allow it to be recovered back." In *Kelly* v. *Solari*, Thesiger, arguendo, says, (*p. 56*,) "The rule is, that if money be paid under a mistake of fact, it can be recovered back, unless something has subsequently occurred to render it unconscientious to recover it." This doctrine was adopted by the court, and is the rule as we contend for it, that a change in the condition of the defendant must be shown, to prevent a recovery. In the same case, *Kelly* v. *Solari*, Parke, B., says, (*p. 58*,) "The position that the party paying is precluded from recovering the money by laches, in not availing himself of means of knowledge in his power, is based on a dictum of Mr. Justice Bailey in *Milner* v. *Duncan*, and cannot be sustained; * * * but if the money be paid under the impression of the truth of a fact which is *not* true, it may,

generally speaking, be recovered back, however careless the party paying may have been in omitting to use due diligence to inquire into the fact." And again: "I think that where money has been paid under a mistake, i. e., upon the supposition that a certain fact is true, and the money would not have been paid had it been known to the payer that the fact was untrue, an action will lie to recover it back, and it is against conscience to retain it." In *Kelly* v. *Solari*, and *Townsend* v. *Crowdy*, the recovery of the plaintiff did not alter the condition of the defendants; if it had, the defendants would not have been allowed to recover in accordance with the rule as we claim it. But these cases must be considered as entirely upsetting the absurd rule, that mere carelessness and neglect to use the means of knowledge, such as existed in the case at bar, can prevent a recovery, where no injury has been done thereby. These cases have had the effect to change the rule as laid down in *Smith's Leading Cases*, (*note to Marriott* v. *Hampton, vol.* 2, 4*th ed.*) The rule is stated to be, that money paid by mistake of fact cannot be recovered back, where the party paying has been guilty of laches. *The Utica Bank* v. *Van Geison* (18 *John.* 485) is wholly in accordance with *Kelly* v. *Solari.* There the plaintiffs once knew, but had forgotten, a fact, (the memorandum that the note was not to be protested if not paid,) and yet they were not held to have been negligent. At a much earlier date *Price* v. *Neale* was, in effect, overruled by *Bruce* v. *Bruce*, cited in note to *Jones* v. *Ryde*, (5 *Taunt.* 495,) and commented upon by Gibbs, Ch. J., in *Smith* v. *Mercer*, (6 *id.* 77.) This case was exactly like the case at bar, and is a decision in our favor, and overrules *Price* v. *Neale.* For it is certain that unless the Victualing Office, the drawee of the bill, could have recovered the amount from the Bank of England, and the Bank of England could have recovered it from the plaintiff in that case, (*Bruce* v. *Bruce*,) the plaintiff would not have recovered from the defendant.

VI. After a consideration of these authorities, we ask the court to consider, on principle, the rule contended for by the plaintiff. What is the sense of saying that a mere lucky accident shall authorize a man to retain my money which has come into his hands by that accident, and where he will be no worse off by repaying it, than if he had never received it? My negligence and carelessness is no reason why I should lose my money, unless some one has acted upon it, and been injured thereby. You might as well say that if by my careless way of carrying my pocketbook I lose it, the finder may conscientiously retain it, because of my negligence in losing it. One rule would be as sensible as the other. Lord Mansfield says, in *Price v. Neale,* that it can never be against good conscience for the defendant to retain the money under such circumstances. The absurdity of this doctrine is well exposed by Chambre, J., in *Smith* v. *Mercer,* (*p.* 84;) and in extracts made above from the opinions of the judges in *Kelly* v. *Solari,* and *Townsend* v. *Crowdy,* the doctrine that my mere negligence can give another title to my property, is wholly repudiated. Byles, J., says: "It would be inequitable *not* to allow it to be recovered back."

VII. There is one great principle of law by which the right of the defendant to retain this money should be tested, and unless it can apply that principle to us we should recover. This principle is the doctrine of *estoppel in pais.* The doctrine of *Price* v. *Neale* is entirely opposed to the general doctrine of *estoppel in pais.* That doctrine is, that no one is estopped from denying the existence of a fact, or retracting a statement which he has made, unless the other party has acted upon it and will be injured by allowing the truth of the admission, or the existence of the fact, to be disproved. The right of an acceptor to resist the payment of a bill which he has accepted, and his right to recover back the amount of a bill which he has paid, rest on precisely the same grounds; for the court

has seen above, that the right of the party receiving to retain the money, cannot at this day be put on the ground of "*potior est conditio possidentis.*" That doctrine of Lord Mansfield was repudiated in the cases cited, point IV, and in *Kelly* v. *Solari*, &c. The paying, or certifying, a forged check are equally negligent acts on the part of a bank, and must have precisely the same effect on their rights. (*See Canal Bank* v. *Bank of Albany*, (1 *Hill*, 289;) *Goddard* v. *Merchants' Bank*, (4 *N. Y. Rep.* 152.) Now the rule of *estoppel in pais* is laid down in *Plum* v. *Cattaraugus Ins. Co.*, (18 *N. Y. Rep.* 392, 395,) and in the other cases cited in 2 *Abb. Dig. p.* 587, and is this: That an *estoppel in pais* will exist against a party where it appears, 1st. That he has made an admission which is clearly inconsistent with the evidence he proposes to give; 2d. That the other party has acted upon the admission; and 3d. That he will be injured by allowing the truth of the admission to be disproved. A drawee who pays a bill admits that the signature is genuine. To hold that he cannot disprove it as against one who will not be injured by allowing it to be disproved, is to fly in the face of all the cases on estoppel. If a man brings me a note purporting to be signed by myself, and asks me if it be genuine, and I say it is, I presume no lawyer would contend that I am estopped from denying the signature, in a suit against me, unless the holder took it afterwards on the strength of my admission, or unless, relying on the admission, he had failed to charge the indorsers, or something of this kind; and if I had paid such a note, I could recover it back. The Court of Appeals has decided this very point in *Merrill* v. *Tyler*, (*Selden's Notes;* 47, cited in 2 *Abb. Dig.* 588, § 106.) They there hold that a man's admission as to the genuineness of his own signature only estopped him to the extent that the other party had acted upon it, and would suffer actual damage. Yet, how is it more negligent not to know my customer's signature than not to know my own?

The *Continental Bank* v. *Bank of the Commonwealth,* tried in the Supreme Court, in the April term, first district, before Judge Noah Davis, was put to the jury on that principle, i. e., that a taking of the paper on the faith of the admission must be shown.

VIII. Thus stands the case upon principle, and the authority of later cases and text books is also against the doctrine of *Price* v. *Neale.* First, we have *Kelly* v. *Solari,* and *Townsend* v. *Crowdy,* cited above. Then Chitty, in the last edition of his Treatise on Bills, (12th ed. 1854,) at marginal page 431, says: "It has been contended that a payment to a *bona fide* holder of a forged draft cannot be recovered, because the drawee was bound to know the handwriting of the drawer and the genuineness of the bill; and because the holder, being ignorant of the forgery, ought to have the benefit of the payment by mistake. But, on the other hand, it may be observed that the holder who obtained payment cannot be considered as having shown sufficient circumspection. He might, before he discounted or received the instrument in payment, have made more inquiries as to the signatures and genuineness of the instrument, even of the drawer or indorsers themselves, and if he thought fit to rely on the bare representation of the party from whom he took it, there is no reason that he should profit by the accidental payment, when the loss has already attached upon himself, and where the payment to him has not altered his situation or prejudiced him. Of late, these considerations have influenced the courts in their decisions." So Chitty says, at same place: "Gibbs, Ch. J., alone placed the decision in *Smith* v. *Mercer* (6 *Taunt.* 76) on the true ground, to wit, 'that the plaintiff's delay in making the discovery destroyed the remedy over the defendant.'" In *Goddard* v. *Merchants' Bank* (2 *Sand.* 253) the court fully indorse these remarks of Chitty, and say that the decision of the court (afterwards affirmed) was much influenced by it. So the language of

Chitty is approved in *Ellis* v. *Ohio Life Ins. Co.*, (4 *Ohio Rep.* [*N. S.*] 659,) cited below. In *McElroy* v. *Southern Bank of Kentucky*, (14 *Louisiana An. Rep.* 458,) the court laid down the rule precisely as we contend for it, and held that the plaintiff could recover in a case precisely like the one at bar, inasmuch as they had not done anything to give currency to the bill before the defendants took it. The case of the *Canal Bank* v. *Bank of Albany*, (1 *Hill*, 287,) was a case where the plaintiff paid on a forged indorsement, and it was held it could recover. This case is not, of course, analogous to the one at bar; but Judge Cowen, on page 290, makes some remarks upon the point under discussion. He says: "It was said in these cases that the payer takes upon himself the knowledge of his correspondent's handwriting; even this is going a great way, unless some bona fide holder has purchased the paper on the faith of such act." This is an intimation in favor of the rule as we contend for it. *Ellis* v. *Ohio Life Ins. Co.*, (4 *Ohio Rep.* [*N. S.*] 628,) which we shall refer to hereafter, also adopted the rule as we claim it. In *Parsons on Notes and Bills*, (*p.* 599, *ed. of* 1863,) *Price* v. *Neale*, and those cases, are called the earlier cases, and treated as substantially overruled. The case of the *Irving Bank* v. *Wetherald* (36 *N. Y. Rep.* 335) wholly admits the principle claimed by us. This case decides that the certification of a check by a bank being an admission of a fact within the peculiar knowledge of the bank, binds it, and the bank is estopped from denying it as against any one who has acted on the admission. But where the bank certifying informed the other party of the mistake in time for the latter to charge indorsers, and before any change of circumstances had taken place, the former was not bound by the admission. Now the right to recover money paid on a forged bill, being treated by all the cases as resting on precisely the same principles as the right to resist the payment of a forged bill which has been accepted, (the idea that mere

National Park Bank *v.* Ninth National Bank.

*possession* gives any title to the money having been exploded,) the case just cited conclusively establishes the principle we contend for.

IX. Now let us apply these authorities and principles to the case at bar.

Here, the Lexington National Bank bought this bill outright from Fanchon, who was cognizant of the forgeries; in other words, he was the forger. They then sent it on here to the defendant, to whom we paid it. We paid it on April 12th, 1867, and did not discover the forgery and give notice until May 10th, 1867. If we are allowed to recover this money, will the defendant be any worse off than if we had refused payment on April 12th? We say not. In the first place, it will be said that if we had refused payment on April 12th, the bill would have been protested and the indorser and drawer held, and that they are released by our negligence. But this is not so; no protest, or notice of protest, was necessary to enable the defendant to have its full remedy against all previous parties. The drawer is not discharged, because there is no drawer, the name being forged; or rather, there is a drawer only as to the $14.20, and *that* we are liable for. The defendant does not need any protest or notice to enable it to recover against the Lexington City Bank. If it held it for collection, it can recover against its principal, as on money paid by mistake. (*See Goddard* v. *Merchants' Bank*, 4 *N. Y. Rep.* 151.) If the defendant *bought* it from the Lexington bank, it can recover on the implied warranty that the instrument is genuine, and the Lexington bank need no notice to enable it to recover against the forger, Fanchon. (*See* 4 *N. Y. Rep.* 151.) The principle that there is no need of notice of dishonor to enable each party to recover against all those whose names were on the bill when he took it, is perfectly well settled. (*See Jones* v. *Ryde*, 5 *Taunt.* 493; *Gompertz* v. *Bartlett*, 24 *Eng. Law and Eq.* 156; *Herrick* v. *Whitney*, 15 *John.*

240 ; *Shaver* v. *Ehle*, 16 *id.* 201.)    Therefore the one ground
on which Gibbs, Ch. J., bases his opinion in *Mercer* v.
*Smith*, and which Chitty says is the only true ground, to
wit, the *release of indorsers*, is wanting in this case.    It does
not appear in the complaint whether the defendant bought
this bill from the Lexington City Bank or received it as
agent, for collection.    It makes no difference which it was.
If it received it for collection, and before notice had
paid over the amount and settled its accounts with its
principal, perhaps we should have been obliged to bring
this suit against the principal, though it would not affect
our right to recover against *some one*, and would not affect
the principles we have been discussing above.    But even
this would not be so, unless we knew it was agent when
we paid it.    (*See Canal Bank* v. *Bank of Albany*, 1 *Hill*,
293 ; and *Merchants' Bank* v. *McIntyre*, 2 *Sand.* 435.)    And
*Fuller* v. *Smith* (1 *Carr. & Payne* 198) holds that in no
case should we be obliged to sue the principal instead of
the agent, to whom we paid the money.    But it is enough
to say, on this point, that even if the language of the com-
plaint imported (which it does not) that the defendant
held the bill as agent for collection, still the payment over
to its principal, and that we knew it to be agent, must
be pleaded.    The point cannot arise on this demurrer.
In considering whether we ought to recover against the
defendant, we must consider whether the defendant can
recover even against the Lexington bank ; and we admit
that whatever circumstances would render it inequitable
for us to recover against the Lexington bank, should pre-
vent our recovery against the defendant, inasmuch as the
Lexington bank will finally have to bear the loss.    If the
Lexington bank, or the party (Fanchon, so called,) from
whom they received the draft, has become insolvent be-
tween the time of the payment of the draft by us and our
discovery of the forgery, then we ought not to recover the
amount from the defendant because injury has resulted

from our act. But such insolvency, if it exist, is matter of defense, and must be alleged, which is not done in the answer. Dallas, J., intimates, in *Smith* v. *Mercer*, (*supra*,) that it must be alleged and proved by the plaintiff in such a case, that no change has occurred, to the injury of any parties, by the neglect of the plaintiff. This was a casual remark, and such a doctrine is opposed to several principles of law. In the first place, it requires the plaintiff to allege and prove a negative, i. e., that the parties have not become insolvent. Secondly, those matters are more peculiarly within the knowledge of the defendant than of the plaintiff—the Lexington bank the immediate correspondent of the defendant, and Fanchon being the correspondent of the Lexington bank, while neither of them have any relations with the plaintiff; therefore, any proof as to change of circumstances in those parties comes more properly from the defendant than from the plaintiff. Thirdly, the presumption of law is that a man is solvent rather than insolvent: if the latter is claimed, it must be proved. (*Walrod* v. *Ball*, 9 *Barb.* 271, 276.) Fourthly, an estoppel must be strictly proved; and if we have shown, as we think we have, that this is to be construed on the principles of all other alleged acts of estoppel, then the defendant, or party claiming the estoppel, must make out all the facts necessary, and among others show the change of circumstances. We think these four reasons are conclusive as to the duty of the defendant to show these facts if they exist. The dictum of Dallas, J., was uttered when it was held and supposed that a drawee who had inadvertently paid a forged draft had no rights which any one was bound to respect. Since the decision of *Kelly* v. *Solari* he cannot however be considered as an offender, as it were, and the rules of pleading which apply to ordinary cases of estoppel must be applied to him. But it may be said that even though there may have been no change in the solvency of the parties, yet that our delay facilitated the escape of the

forger.   Our answers are, first, that the arrest of the forger
is a public and not a private remedy, and the court can-
not presume that the simple arrest of the forger has any
relation whatsoever to the recovery of the money.   If it
be said that it gave the forger time to remove his property,
our answer is that the court must presume that all man-
kind act with common sense and ordinary prudence, and
must assume that the forger had as securely taken off him-
self and his property within three days, after he passed
this draft to the Lexington bank, as he had in thirty days,·
and so nobody lost anything in that respect.   And again,
the reasons given above for putting the burden of allega-
tion and proof as to solvency, &c., upon the defendant
rather than on the plaintiff, apply equally to the supposed
loss from giving the forger more time to escape.   If there
were any loss from that cause, the defendant must allege
and prove it.   Again, the loss from the possible removal
of property by the forger is too remote to be taken into
consideration, even if alleged and proved.   The furthest
the law will go is to consider whether the party responsi-
ble has lost his property (i. e. become insolvent) by our
delay, so as to impair the remedy over of the defendant;
whether he has removed it, or put it into a shape where it
would be less accessible, is too remote a damage to be
considered.   In *Utica Bank* v. *Van Geison*, (18 *John.* 485,)
the plaintiffs had paid, under a mistake of fact, in which
they were certainly as much chargeable with negligence
as we are here, and yet they were not required to show
that the solvency of the maker of the note had not
changed—although, if it had changed, that fact would no
doubt have been a defense, inasmuch as the act of the
plaintiffs in paying over the money to the defendant had
induced the defendant to abstain from suing the maker.
But it was left to the defendant to show it.   Therefore we
say we are entitled to judgment on this demurrer, because
the sound rule is that we can recover unless our delay has

produced a change for the worse in the condition of the defendant, which it is for him to allege and prove.

X. Next, we claim the right to recover on this further ground. That no matter what loss to the defendant be alleged and proved as a consequence of our delay, yet where both sides are guilty of carelessness, the loss must fall upon the party who has been guilty of the first negligence in point of time, and we claim as a matter of fact that this is the defendant. And our argument here is, that whatever may have been the case at the time that *Price* v. *Neale* &c. were decided, yet the rule and practice now are, that a bank presenting paper to another bank for payment is supposed to have made proper inquiries as to its genuineness, and to have satisfied itself as to the character of the parties &c. from whom it was received. That it is well understood among banks, that the bank paying relies much upon this supposed scrutiny of its predecessors, and that to use the words of Abbott, Ch. J., in *Wilkinson* v. *Johnson,* "the circumstances of the call upon the drawee, may reasonably lessen his attention." The bank presenting the paper for payment, thus (according to the custom of banks in their dealing with each other) taking some part of the responsibility, is, in the case of a forged bill, guilty of the prior negligence, and comes within the cases which hold that the party paying can recover where all the negligence has not been on its side. *Wilkinson* v. *Johnson* goes the entire length of holding that the party guilty of the prior negligence must bear the loss. The case goes upon the doctrine that presentment of a bill for payment for honor is an assertion in fact, if not in words, that the bill is all right. We say that, under the modern system of banking, the presentation by one bank to another, is a representation that it is all right. (*See also Chitty on Bills,* 431.) *Byles on Bills,* 9th edition, (1866,) 324 and 325, says: "Money paid under a mistake of fact, may be recovered back. But any fault or negligence on the part of him who

pays the money on the note, will disable him, (this is exploded by *Kelly* v. *Solari,* unless actual damage be caused;) but where the fault is not entirely on the part of the party paying, he may recover." This recognizes the principle that the prior negligence in point of time, must bear the loss. See *Ellis* v. *Ohio Ins. Co.,* (4 *Ohio,* [*N. S.*] 628,) a very strong case on this subject. And *Price* v. *Neale* goes on the principle that "all the negligence" is on the part of the party paying. Therefore, if we show that part of the negligence was on the part of the party taking the draft from the forger, *Price* v. *Neale* does not apply. In *Wilkinson* v. *Johnson* the court said, from the nature of the case, that the presentation of the draft " reasonably lessened the caution of the plaintiffs." They did not require proof of · any custom to rely somewhat on the party presenting. So the court being presumed to know the general course of business, must know without any proof the effect which the presentation by a respectable bank must have had to lull the caution of the plaintiff. The question really is, not whether it is the custom for banks to rely on the representation of genuineness implied by the presentation, but whether the bank paying must not in the nature of things be affected by the circumstances of such presentation, so as " reasonably to lessen its caution." That the court takes judicial notice of the course of business among banks, see *Smedes* v. *Utica Bank,* (20 *John.* 377 ;) *Bronson* v. *Wiman,* (10 *Barb.* 406, 425 ;) and *Smith* v. *N. Y. Central Railroad,* (43 *id.* 231.)

XI. But it may be said that although as a general rule no man is estopped from repudiating his acts or words unless the other party has suffered damage therefrom, yet the credit of negotiable paper requires a different and peculiar rule. To this we answer, 1st. That in no case is this rule put upon the peculiar nature of negotiable paper. 2d. That the credit and free circulation of negotiable paper is not promoted by the rule that a drawee who pays a

forged draft cannot recover the amount, though his carelessness has done no harm, unless the possibility that a drawee may, by mistake, pay the draft, though forged, enters into the calculation of those who deal in paper, which we deny to be the case. One who is about to take a piece of paper considers two things: 1st. Is it genuine; and, 2d. Are the parties solvent? The chance that even if it be a forgery the drawee may by accident pay it, never enters into the contemplation of any one, and the rule cannot, one way or the other, have the slightest bearing upon the currency of negotiable paper. Moreover, these cases are so very few in number that their effect would not be appreciable any way. None of the cases have been put on the ground of the " sanctity of commercial paper;" and if that were the ground, *Goddard* v. *Merchants' Bank*, and *Bank of Commerce* v. *Union Bank*, are as much a violation of it as this case. See 4 *Ohio R.* (*N. S.*) 665, on this doctrine of sanctity of commercial paper as applied to forged paper.

XII. Although this precise point, i. e., the point involved in *Price* v. *Neale*, has never been decided in this State, yet the tendency has been in favor of the plaintiff recovering in such cases. Thus in *Bank of Commerce* v. *Union Bank*, (3 *N. Y. Rep.* 230,) the court held that the drawee could recover when the alteration was in the body of the instrument. And in *Goddard* v. *Merchants' Bank*, (4 *N. Y. Rep.* 147,) they hold that a person who pays for honor without looking at the bill can recover, and surely the negligence of one who pays without looking at the bill is greater than that of one who looks and is deceived by the nicety of the forgery. These cases, as stated above, certainly assumed the rule to be as claimed by the defendant; though Judge Ruggles, in his opinion, at p. 152, recognizes and admits the doctrine of " actual damage," which we contend for. But the point was not involved, and the cases show a tendency to make exceptions to the supposed rule, and it is

believed that if the question had been before the court, the absurdity of the rule of *Price* v. *Neale* would have led to its entire repudiation and to the establishment of the rule as above laid down.

XIII. *U. S. Bank* v. *Bank of Georgia* (10 *Wheat.* 333) is an authority against us. But that case rests upon *Price* v. *Neale*, and if the modern decisions and principles have upset that case, the case just cited must fall also. Moreover, that case was a case of one receiving that which he had issued as money, and there are reasons of public policy well set forth in 10 *Wheaton*, pages 345 and 347, which make a distinction between the case of money and bills of exchange. One practical reason why a bank which has received what purports to be its own bills issued as money should not be allowed afterwards to repudiate them is, that in most cases it would be impossible to trace back money, and to remember when and from whom it had been received, which is not the case with bills of exchange. But on the principles above set forth we deny the soundness of the rule, even as to money. *Levy* v. *U. S. Bank* (*Dall.* 234) is a *nisi prius* case, and not at all considerable, and can be of but small authority. *Young* v. *Adams* (6 *Mass. R.* 187) is also a case of money. But the best answer to all these cases is that they rest on *Price* v. *Neale*, and that that case, as authority for the rule to the extent contended for by the defendant, has been much weakened, and in many cases overruled by subsequent decisions, as above stated. That it has not been overruled in England is, it is believed, because the question has not been presented for decision of late years. The case of the *National Bank of the Commonwealth* v. *Grocers' National Bank* (35 *How. Pr.* 412) will, no doubt, be cited against us. But that case involved only a small amount, and does not seem to have been very thoroughly argued; and, moreover, it was rested distinctly upon *Price* v. *Neale*, without any examination into its principle, and upon dicta of the Court of Appeals.

And also the loss resulting from the payment of the check seems to have been assumed, and the case to have been decided upon that assumption.

As to Judge Sutherland's opinion in this case at special term, we respectfully submit, that it is hardly correct to say that the doctrine of *Price* v. *Neale* was adopted by a majority of the judges (if that is meant by the word "recognized," used by Judge Sutherland) in *Smith* v. *Mercer.* Chambre, J., distinctly repudiates it, and Gibbs, Ch. J., neither assents nor dissents from this doctrine, but puts the case on the ground of a discharge of indorsers, which ground does not exist in this case. Dallas, J., also gives the element of actual loss and change in the holder's condition a prominent place in his decision. The fact that the plaintiffs in *Smith* v. *Mercer,* and *Cocks* v. *Masterman,* were not the drawees, but the bankers of the drawees, is, we think we have shown above, immaterial. The recognition of the doctrine of *Price* v. *Neale* in *Canal Bank* v. *Bank of Albany ; Bank of Commerce* v. *Union Bank,* and *Goddard* v. *Merchants' Bank,* is wholly *obiter,* as has been above shown. Judge Sutherland puts the case wholly on authority, and does not discuss it on principle, and he wholly overlooks our point (elaborated below) that we are not within *Price* v. *Neale,* inasmuch as all the negligence in our case is not on the part of the plaintiff. The case of *The Commercial National Bank* v. *The First National Bank of Baltimore,* in the Maryland Court of Appeals, (*Transcript, March* 27, 1869,) may be cited as an authority for the defendant. But in that case the defendant did not pay the forger the money *until the plaintiff had paid the check.* The payment to the forger was on the faith of the act of the drawee. Here the Lexington Bank paid the money to the forger before we ever saw the check; and this is the distinction, and a vital one. The case cited merely lays down the law as we admit it to be. It is rather an authority *for* than *against* us. The court say distinctly in the

opinion, "Had the defendant cashed the check at once instead of receiving it on deposit, it certainly would have incurred the risk of loss to itself." This is exactly what the bank did in the case at bar.

XIV. Heretofore we have treated this case as if the draft were a simple case of a forged draft, and we submit that we have shown that principle and good sense, and all the modern authorities are in favor of our right to recover even in that case. But let us now look at the particular facts and circumstances of this case. We claim to have established that the rule of *Price* v. *Neale* is at least not to be extended, and that the tendency of all the later cases, even where they do not overrule *Price* v. *Neale*, is to restrict it by exceptions and distinctions. The cases of the *Bank of Commerce* v. *The Union Bank* (3 *N. Y. Rep.* 230) and *Goddard* v. *Merchants' Bank* (4 *id.* 147) are instances of this tendency. In the first named case it was decided that the drawee may recover the money paid where the alterations are in the body of the bill, inasmuch as the drawee is not responsible for such alterations. Now we shall be told that the principles of the *Bank of Commerce* v. *Union Bank* cannot apply to us at all, because this is not the case of an altered bill, but of a bill forged *de novo*. But let us consider the reasons why this should not be considered the case of a simply forged bill. In the first place it may be reasonably argued that the drawer's signature is to all intents and purposes genuine. "William Ridgely, cashier," wrote his name on this draft with the intention of binding the Ridgely bank to the extent of $14.20, and the Ridgely bank has actually received the $14.20 from the person who bought the draft, and is equitably bound to allow, and has in fact allowed, us to charge them with that amount. The name having been written with the intention of binding the Ridgely bank to the extent of $14.20, the fact that the forger took out the name does not destroy the effect of this intention. Any holder could recover the

$14.20 from the Ridgely bank, certainly in an action for money had and received, if not on the draft, and the draft is an authority to the Park Bank to charge the Ridgely bank with that amount. If any person had simply drawn a pen-mark through the name "William Ridgely, cashier," it would not have destroyed it as a binding obligation, and if he had also rewritten the name over the old one, after having drawn a pen through it, it would not have altered the case, or made the pen-mark any more destructive in its effects. Now, erasing the name by acids is only different in degree from simply drawing a pen-mark through it. The signature is only important as evidence of the intention to draw for $14.20. This intention is also evidenced by other parts of the draft—the number of it—and by the mere fact of the giving of it, and may be proved in any way, so that you prove it. The erasure of the signature (provided you supply by other proof, the effect of it, i. e., show that this piece of paper was actually delivered as an obligation for $14.20, which is shown in this case) does not cause the draft to cease to be genuine. Therefore, it is absurd to reason as if this were a forged draft in the drawer's signature; it is a genuine draft for $14.20, altered in the amount, and we are directly within the *Bank of Commerce* v. *The Union Bank.*

XV. But even if we are wrong in this argument, that the drawer's signature, after having undergone the treatment which it has in this case, is wholly equivalent to a genuine signature; yet, we earnestly submit that it would be unjust to consider it as wholly equivalent to a forged signature. If not genuine, it has many elements which make it fall short of a forgery. The defendant claims that all the written parts of the draft having been taken out by the forger, the case is to be considered precisely as if the draft had been written on an entirely new and fresh piece of paper. Now this will not do, for when you bear in mind that the supposed objection to our recovery is the case of

*Price* v. *Neale*, and that this case is put solely upon the
ground of the negligence of the plaintiff; or party paying,
it is clear that the court ought to discriminate between the
case at bar and a forgery *ab initio*, provided that we show
that our negligence is necessarily less in degree, and more
excusable, in having paid a draft altered in this way, than
if we had paid a simple forgery. The following are some
of the reasons why we were not as negligent in paying
this altered draft as we should have been in paying a
forged draft: In deciding upon the genuineness of a draft,
the drawee considers not only the handwriting of the sig-
nature, but the engraving of the blank on which it is
written, the cancelling stamp, the number of the draft—
which was not changed in this case—and, in many cases,
private marks on the blank. It is well known that these
blank drafts are made by the Bank Note Company, espe-
cially for the different banks, and delivered to and care-
fully kept by them alone, and that the numbers are never
duplicated. It may have been that in this very case the
plaintiff's teller doubted the drawer's signature, but was
reassured by the number or by private marks on the draft.
It is not necessary to show that he actually was so reas-
sured, because these things are only mentioned as instances
to show how unjust and far from the truth it would be for
the court to hold, as the defendant claims they should hold,
that this altered draft is to be considered precisely as if
it were a forged draft, and the negligence of the plaintiff
as great in the one case as it would have been in the other.
For the court to decide that there is no difference between
an altered check of this kind and an entirely forged check,
is to deprive a drawee of the aid of all those means of
detecting forgeries. It is to hold that one who pays an
altered draft—where all the circumstances above men-
tioned may have dispelled any doubt which he may have
had about the genuineness of the signature—is as careless,
and is to be visited by the same consequences, as if he had

paid an entirely forged draft. This cannot be. The defendant assumes that when all the writing was taken out of the draft, it was merely a blank. Not so. The number was left, and, possibly, private marks, and the engraving, revenue stamp, &c., and other points of the bill with which the plaintiff's teller was familiar. It was far short of a mere blank. For the reasons above stated this must be considered, if not a genuine draft as to the drawer's signature, which we have claimed above, and which would at once dispose of this case, yet certainly as an altered and not a wholly forged draft. Then our argument is, that as we are responsible only for the signature of the drawer, and the defendant is responsible for changes in the amount, each must bear the loss arising from these changes respectively; we the original amount, and the defendant the enlarged amount. In other words, we paid this draft in ignorance of three material facts—under three mistakes of fact: as to the signature of the drawer; as to the changes in the amount; and the indorser. We are estopped from denying the former as genuine, but not the two latter. If we are estopped from denying the genuineness of the drawer's signature, the result simply is that the signature of the drawer is to be taken as genuine —is genuine—and this is simply an altered draft, for which alteration the defendant is responsible.

An estoppel never makes a fact more than true. The doctrine that we cannot dispute the signature of our drawer, that we are estopped from denying it, cannot surely have a greater effect than to make true the fact which we are estopped from denying, and yet if the fact were true, i. e., the drawer's signature genuine, we could recover. The defendant seeks to give this mysterious effect to the doctrine of estoppel : that it does not merely make true the fact which we are estopped from denying— that is, make the drawer's signature genuine—but also has

the effect to excuse all its negligence in not detecting the alterations for which it was responsible.

Again, I have a perfect right to recognize the signature of a drawer as a genuine one, (although I know it to be forged,) without subjecting myself to any other loss than legitimately belongs to the falsity of the signature. For instance, suppose a drawee knows that the forgery (of the name of the drawer) is by his (the drawee's) own son, and chooses to adopt it, and pay the draft, rather than expose him; cannot he do this without also adopting an alteration in amount which some other forger has chosen to put on it subsequently? I suppose there would be no doubt of this. Now, in our case, it is probable that both the forgery or alteration of the signature of the drawer, and the alteration in the name of the payee and the amount, were made by the same persons, (though this does not appear;) but this certainly cannot change the principle.

XVI. But we are not within the doctrine of *Price* v. *Neale* at all. Considering this draft as what it is, a draft altered in three respects, let us see what are the consequences which follow. It is a well settled principle of law that every person who transfers a piece of mercantile paper, or any other chattel to another, impliedly warrants that it is genuine, and what it purports to be. This is so, whether the party transferring indorses the paper or not. (*Gibbs, Ch. J.,* in *Jones* v. *Ryde,* 5 *Taunt.* 488. *Gompertz* v *Bartlett,* 24 *Eng. Law and Eq.* 158. *Young* v. *Cole,* 3 *Bing. N. C.* 730.) Although there is not always an implied warranty as to quality, there is always such a warranty that the thing purported to be conveyed has an existence— that it is what it purports to be. For instance, that what purports to be a horse, is a horse; that the horse purported to be conveyed is in existence; that what is transferred, as the note of John Doe, was made by John Doe, &c. That the genuineness of the drawer's signature is not guaran-

National Park Bank *v.* Ninth National Bank.

tied as against the drawee is an exception to the general rule; but even the genuineness of the drawer's signature is vouched for by the transfer, as against every one, except the drawee; and this exception rests upon peculiar grounds. But the *Bank of Commerce* v. *The Union Bank* shows that the exception extends no further than the drawer's signature, and does not extend to the body of the instrument. As to the body of the instrument, the general rule prevails that a transfer warrants its genuineness. The distinction between a warranty as to quality, which is not impliedly made by the mere act of transfer, and a warranty of the genuineness or the existence of the article, may be illustrated thus: The transferrer does not warrant by the mere act of the transfer, that the note is good, i. e., will be paid; but he does warrant that John Doe made it. Now, bearing in mind the undeniable fact that the defendant, as holder and transferrer, was responsible for the genuineness of all parts of this draft, except the drawer's name, and as between it and us was bound to know of any alterations in it, it follows that we do not come within the case of *Price* v. *Neale* at all. That case rests on the fact that "all the negligence was on the part of the plaintiff or party paying;" and Ch. J. Abbott decides, in *Wilkinson* v. *Johnson,* (as quoted, *supra,*) "That where there is any fault in the party receiving, and he cannot be said to be wholly innocent, he ought not to profit by the mistake into which he may by a prior mistake have led the other." And Byles says, in the extract quoted *supra,* "Where the fault is not wholly on the part of the party paying, he may recover." Therefore, it is only necessary to show here that some part of the negligence is on the part of the defendant. In this case the defendant is chargeable with negligence in not detecting the alterations in the body of the draft, and, therefore, "all the negligence" is not on our side. By negligence, in all these cases, is meant not negligence in fact, but, rather,

negligence in law, i. e., an omission to discover that which the law says one is bound to know. No evidence of the nicety of the forgery, that it was so exquisite that the drawer himself could not detect it, and that therefore there was no negligence in fact, will enable the drawee to recover under *Price* v. *Neale.* This shows that the negligence is negligence in law—an omission to discover what one is bound to know. Now it is clear that the holder guaranties the genuineness of the body of the draft, and therefore he is bound to know that it is correct. Is it not an absurdity to say that one is not bound in law to know the correctness of a fact which the law says he guaranties? The holder being thus bound to know that the body of the bill is correct, his omission to inform himself on the subject is precisely the same kind of negligence that the drawee is guilty of. The body of the bill had undergone exactly the same treatment that the drawer's name had. Therefore, we repeat, all the negligence in this case is not on the part of the plaintiff. Now, when the defendant received this piece of paper and brought it to us, it guarantied to us the genuineness of the body of the instrument, and in contemplation of law it was bound to know if anything were wrong about it. It was negligent before we ever saw it. It came to us chargeable with a negligence prior to ours in point of time. It came to us in default, as it were, and it cannot now invoke, to save itself from a recovery by us, the principle of a case—*Price* v. *Neale*—where "all the negligence was on the part of the plaintiff."

XVII. Now, the defendant will say, that although it is true that if the drawer's signature had been genuine, the defendant would have been bound to repay to us the money paid, because it is responsible for alterations in the body of the instrument, yet the rule does not apply where the drawer's name is also forged. Let us see how much reason there is in any such restriction of the rule.

Did the defendant become any less liable for its omission to discover the changes in the body of the bill, because we too made a mistake as to the drawer's name? Shall our mistake excuse its? If our mistake as to the drawer's signature had been the cause of its, or had had any tendency to mislead it as to any point on which it was bound to inquire, there would be some sense in saying that our mistake excused its, otherwise not. But our mistake was after its. It had failed to detect the alterations in the body of the bill before we ever saw it. Its passing over the alterations without discovering them, deceived us, instead of ours having deceived it, because we were certainly influenced by the fact that the paper had come through its hands without any wrong being detected. Our mistake having occurred after its, surely had no effect on its judgment in the premises, nor any tendency to throw it off its guard.

XVIII. If it be said that had we done our duty, and detected the forgery of the drawer's signature, the draft would not have been paid at all, and there would have been no loss, we answer that had the defendant and those behind it done their duty, and detected the alterations in the amount and payee when the draft first came into their hands, there would have been no loss at all, for the whole swindle would have been detected at the outset. The legal effect of the whole transaction is this: The defendant comes to us with this draft, and says (as the law implies) "it is all right as to the body thereof; is the signature correct?" We thereupon say, "the signature is correct." It appearing afterwards that we are both wrong, the defendant coolly says, "you misled us; you ought to have detected the forgery of the drawer's name; you were negligent, and you must bear the loss." Did not it mislead us? Did it not say that the body of the bill was all right? Was it not negligent? And is it not somewhat impudent for it to invoke in its behalf a case wherein "all the neg-

ligence was on the part of the plaintiff." The only logical and fair adjustment of the loss is to hold that each must be responsible for the loss occasioned by the alterations for which they respectively are responsible—we for the original amount, and the defendant for the enlarged amount.

XIX. The defendant's argument is this: It admits that had the signature of the drawer been genuine, we could undoubtedly have called the defendant to account for the alterations in the body, on the doctrine of the *Bank of Commerce* v. *Union Bank,* (*supra,*) but the drawer's name being forged, we cannot, they say, raise any objection to the rest of the bill. Now, we have clear authority for the position that the forgery of the name of the drawer does not preclude the acceptor, or party paying, from disputing any other point about the bill. In 2 *Parsons on Bills,* 590, it is said: "If the drawer's signature be forged, the acceptor must yet pay the bill; but if he suspect some indorsement to be spurious, he may yet (i. e., in spite of the drawer's signature being forged) require the holder to show title through a genuine transfer." In *Beeman* v. *Duck,* (11 *Mees. & Wels.* 251,) the defendants accepted a bill purporting to have been drawn on them by Bradshaw & Williams, to the drawer's own order. Bradshaw & Williams were a real firm, and the signature of both the drawers and indorsers were forgeries. It was *held,* that where the party purporting to be the drawer was a real person, (not fictitious,) the acceptor, although he was estopped from setting up the forgery of the drawers named, could question the indorsement. In *Cooper* v. *Meyer,* (10 *Barn. & Cress.* 468,) Lord Tenderden says the same thing of cases where the drawer is a real person, but makes a distinction in the case of a bill drawn and in- dorsed by a person having no real existence. This dis- tinction is no doubt proper, because one who accepts a bill of course knows whether the drawer is a real person; and

if he accepts a bill drawn in a fictitious name to the order of the drawer, it is reasonable to hold, as was done in *Cooper* v. *Meyer*, that he undertakes to pay on an indorsement in the hands of the same person who appears as drawer. But in our case, to use the words of Baron Parke, in *Beeman* v. *Duck*, "the drawer really existed, though his signature was forged." Though the points disputed in the cases above cited were the indorsements, yet the principle applies as well to changes in the amount—the principle above settled being that the fact that the drawer's signature is forged, does not prevent the acceptor or drawee from questioning such other parts of the bill as he could have questioned had the drawer's name been genuine; in other words, that the fact that the drawer's name in this case is a forgery, or not genuine, does not prevent us from raising the same objections, based upon the alterations in the body of the bill, which we otherwise could do.

XX. We respectfully ask that a decision be given upon all the points presented, to wit: 1st. That where there has been any negligence on the part of the party receiving, the plaintiff may recover; i. e., that the loss must fall where the first negligence in point of time has been. 2d. That even where all the negligence is on the part of the party paying, we may recover unless actual damage has occurred from change of circumstances. We ask the court to complete the work which other courts or text books have partly done, and to authoritatively upset, or rather modify, the doctrine of *Price* v. *Neale*. 3d. That even if both these propositions are wrong, yet this is an altered draft, wherein the signature is genuine to all intents and purposes for $14.20, as originally drawn. 4th. And even if it be not a genuine signature of the drawer, yet we are only responsible for the original amount, and the defendant for the alterations. That the

case comes within the *Bank of Commerce* v. *Union Bank*. That it does not come within *Price* v. *Neale*, because "all the negligence is not of the plaintiff."

*J. H. V. Arnold*, for the respondent.

INGRAHAM, J.  I agree that the drawee of a draft is bound to know the handwriting of the drawer; and when he pays a draft on which the name of the drawer has been forged, he is bound to bear the loss to the same extent he would have been if the signature had been genuine.  But the liability extends no farther; and where the genuine draft has been altered, not only in the name, but in the amount to be payable, I do not think that rule should hold the drawee liable for any more than the amount of the original draft; and for the balance the plaintiff should recover.

It must be a very rare occurrence, that a genuine draft should have the name of the drawee removed, and then forged to the same instrument; but I think the rules, as heretofore settled, viz., that the drawee is bound to know the handwriting of the drawer, and is liable for a draft which he pays, although forged; and the other, that where the body of the draft is altered, the drawee may recover the amount from the person receiving it, may both be applied to this case, and should lead to the result before stated.

I am therefore in favor of reversing the judgment.

CLERKE, P. J., concurred.

SUTHERLAND, J., (dissenting.)  I have nothing to add to my opinion below, in this case, except this:  The case of *Jenys* v. *Fawler* (2 *Str.* 946) was alluded to by the counsel for the plaintiff in *Price* v. *Neale*, as reported in 3 *Bur.*

Little *v.* Willets.

1354, and 1 *Black.* 390; and from what Lord Raymond said in that case, it is probable that the rule in *Price* v. *Neale* was really adopted on the ground of public policy; that is, that the adoption of the rule was calculated to promote the negotiability of commercial paper, by promoting confidence in its genuineness.

Judgment reversed, and demurrer overruled.

[NEW YORK GENERAL TERM, June 7, 1869. *Clerke, Ingraham* and *Sutherland,* Justices.]